# In the United States Court of Federal Claims

No. 19-615C
(Originally filed: May 21, 2019)
(Re-issued: May 29, 2019)[1]

* * * * * * * * * * * * * * * * * * * *

FISHER SAND & GRAVEL CO.,

    *Plaintiff*,

v.

THE UNITED STATES,

    *Defendant*,

and

SLSCO LTD.,

    *Intervenor*.

Post-award bid protest; CICA stay override; Urgent and compelling circumstances; Determination and finding; *Reilly* Factors; AFARS 5133.104(b)(a)(A); National emergency; National Security.

* * * * * * * * * * * * * * * * * * * *

    *Scott R. Sleight*, Seattle, WA, for plaintiff. *Elizabeth W. Perka*, of counsel.

    *Anthony F. Schiaveti*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom was *Douglas K. Mickle*, Assistant Director, for defendant. *David Cooper*, *Parag J. Rawal*, *Barbara Hebel*, *Katherine D. Denzel*, *Blake M. Hedgecock*, and *Alexandria Tramel*, U.S. Army Corps of Engineers, of counsel.

    *David R. Hazelton*, Washington, DC, with whom were *Kyle R. Jefcoat*, *Dean W. Baxtresser*, and *Chase A. Chesser*, for intervenor.

---

[1] This order was originally issued under seal to afford the parties an opportunity to propose redaction of protected information. The parties agreed that no redactions were necessary. One erratum has been corrected.

ORDER FOR JUDGMENT

BRUGGINK, *Judge.*

     Plaintiff is a bidder on a solicitation by the Army Corps of Engineers ("COE") to contract for the construction of 46 miles of border fencing in New Mexico. Plaintiff did not receive the award; instead it was given to intervenor, SLSCO, on April 9, 2019. Plaintiff filed a timely protest at the Government Accountability Office ("GAO") on April 18, triggering the Competition in Contracting Act's ("CICA") automatic 100-day stay of contract performance. 31 U.S.C. § 3553(d)(3)(A) (2012). Pursuant to 31 U.S.C. § 3353(d)(3)(C) (2012), COE exercised its authority to override the stay and continue with contract performance. This is an action challenging that override decision. Pending are the parties' cross motions for judgment on the administrative record.[2] Oral argument was held on May 16, 2019. At the conclusion of oral argument, the court announced that it would deny plaintiff's motion for judgment on the administrative record and grant defendant's and intervenor's cross motions.

FACTUAL & PROCEDURAL BACKGROUND

     On February 15, 2019, the President issued a proclamation declaring a national emergency concerning the security of the southern border of the United States. The proclamation recites that the "current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency." Administrative Record ("AR") at 14. The proclamation authorizes the use of armed forces to assist other elements of the government to secure the border. In an undated (but presumably executed in March 2019) Department of Homeland Security ("DHS") memo to the Department of Defense ("DOD"), DHS asked for assistance from the Army in constructing fencing in specific high-risk sectors of the border, all associated with intense drug smuggling activity. *See* 10 U.S.C. § 284 (2012) (authorizing DOD to provide "support for the counterdrug activity or

---

[2] Intervenor also filed a motion to dismiss for lack of standing. SLSCO notified the court that it withdrew that motion during oral argument, and we are satisfied that plaintiff has the requisite economic interest in the outcome of this proceeding to grant this court jurisdiction to hear the matter.

activities to counter transnational organized crime" to any other federal, state, local, tribal, or foreign law enforcement agency).  The priority areas set out in the memo were Yuma and Tucson (in Arizona), El Centro (in California), and El Paso (in New Mexico).

In response, the Assistant Secretary of Defense for Homeland Defense and Global Security sought and received authority from the Acting Secretary of Defense to immediately shift funds for the implementation of Option One, which called for construction of fencing along 11 miles of the border near Yuma and 46 miles near El Paso.  The COE was designated as the construction agent with a budget of up to $1 billion.

On April 4, 2019, relying on Federal Acquisition Regulation ("FAR") part 6.302.2, the COE Senior Contracting Official for the Fort Worth District announced an intent to use an "Undefinitized Contract Action" ("UCA") to contract for the construction of the El Paso portion of the fencing.[3]  It would be a design and build contract.  The effect was to limit dramatically competitive procedures by using less formal letter contracts instead of the more formal definitized contract process.  Nevertheless, because COE had recently competed (July 2018, amended March 27, 2019) and put in place two prequalified contractor lists, consistently with CICA procedures and DFARS regulations, the COE had a list of potential building contractors to consult.[4]  On March 28, 2019, COE sent all nine pre-qualified contractors a solicitation for the El Paso work in the form of 10 narrative questions and a contract line item number structure for the proposed contract.  The questions were listed in descending order of importance.  The solicitation stated that responses to the questions would be evaluated for "reasonableness, logic, and risk."  AR at 68.  COE promised to "select the most advantageous technical approach that meets its mission needs."  *Id.*

Six of the prequalified companies responded to the solicitation.  The agency performed an initial review of the offerors' responses to the solicitation's questions and ranked them according to its own view of the technical merits that those answers revealed.  The Source Selection Authority ("SSA") decided that only two of the six, SLSCO and another

---

[3] A UCA, also known as a "letter contract," allows for award while specific terms and specifications are negotiated and memorialized in writing.  *See* Defense Federal Acquisition Regulation Supplement ("DFARS") § 217.4.

[4] DFARS § 236.7272.

contractor, not plaintiff, were highly enough rated to be evaluated as prospects. The SSA selected SLSCO, the intervenor, as the most qualified and the only firm with which it would negotiate. Permission was sought, and granted on April 5, 2019, however, to proceed to make a commitment to SLSCO, even before concluding price negotiations, on a sole source basis. The Army issued a justification and approval ("J&A") for less than full and open competition on April 8, 2019, authorizing the COE to proceed with award to intervenor on a sole source basis. The J&A stated that no further time could be spent competing and negotiating the contract if the work was to begin this fiscal year and be completed within the 18-month delivery schedule anticipated by DHS and DOD. *See* AR at 36. A traditional, fully competed approach would take, in the Army's estimation in the J&A, nine to twelve months just to make an award. *Id.* In the face of a declared national emergency, that time could not be spent. *Id.*

Fisher became aware that SLSCO would be given the award on April 9, 2019, via a DOD press release. On April 18, 2019, Fisher filed its GAO protest, triggering the automatic stay. On April 24, the agency made a determination and finding ("D&F") that contract performance should continue notwithstanding the GAO protest. AR at 2-13. The D&F states that "urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the Protest" and cites 31 U.S.C. § 3553(d)(3)(C). AR at 11. It goes on to detail the government's view that the border crisis and cost in human capital outweighed, in the Army's view, the minimal effect to the protestor, which the D&F concludes has little chance of winning its protest at GAO. We will discuss the D&F more fully below.

Plaintiff filed its complaint here, challenging the D&F as arbitrary, capricious, and not in accordance with the law, on April 25, 2019. The court convened a status conference on April 29, whereupon a schedule was set for resolution of the merits on an expedited basis. Plaintiff thus forewent a request for preliminary relief. On May 3, 2019, however, plaintiff filed a motion requesting that the record be supplemented to include materials from the Army's consideration of Fisher's protest of the Yuma contract at GAO.

Unlike the El Paso project, the COE did not execute an override for the Yuma protest. Instead, on May 1, 2019, the agency confessed error in the way it had handled the solicitation and notified GAO that it was

terminating the awardee for convenience and resoliciting the work to include plaintiff as a qualified offeror. The GAO protest was dismissed as moot shortly thereafter. Plaintiff argued in its motion to supplement that the agency's decision to dismiss rather than override the stay in the Yuma protest ought to be considered here as evidence of the Army's irrationality in treating like circumstances differently, i.e., because the Army did not need an override for the Yuma protest, it did not need one for the El Paso work either. After receiving expedited responses from the two opposing parties, we denied plaintiff's motion by order on May 16, 2019, finding the circumstances of the two procurements different and thus concluding that the Yuma materials were not necessary for effective judicial review in this case. *Fisher Sand & Gravel Co. v. United States*, No. 19-615C, ECF No. 34 (Fed. Cl. May 13, 2019) (unpublished order denying motion to supplement the administrative record).

DISCUSSION AND CONCLUSION

The thrust of Fisher's challenge to the override is that defendant failed to meet the requirements of Army Federal Acquisition Regulation Supplement ("AFARS") 5133.104(b)(a)(A), which requires the Army to "clearly address" the following four factors in a D&F overriding a CICA stay on the basis of urgent and compelling circumstances:

> 1) Whether significant adverse consequences will necessarily occur if the stay is not overridden;
>
> 2) Whether reasonable alternatives to the override exist that would adequately address the circumstances presented;
>
> 3) How the potential costs of proceeding with the override, including costs associated with the potential that GAO might sustain the protest, compared to the benefits associated with the approach being considered for addressing the agency's needs; and
>
> 4) The impact of the override on competition and the integrity of the procurement system.

These factors are drawn directly from this court's opinion in *Reilly's Wholesale Produce v. Untied States*, 73 Fed. Cl. 705, 711 (2006) (surveying

CICA stay override cases).[5] Plaintiff alleges that the agency failed to adequately address any of the factors and, as to the fourth, failed to address it at all.[6] Our review, as in any bid protest, is one for rationality and illegality. 28 U.S.C. § 1491(b)(2) (2012).

The D&F is a 12-page document, which is supported by over 300 pages of enclosures. The enclosures include: the President's declaration of national emergency; DHS's request to DOD for help to combat drug smuggling at the border; DOD's and the Army's memoranda in response approving such help; El Paso project procurement documents; and the CO's analysis of 100-day construction delay costs.

The D&F itself begins with a background recital of the circumstances leading to its issue and the El Paso procurement's history. Section 4, Effect and Impact of Override, begins the required analysis. There, the agency states that proceeding with the override will allow SLSCO to begin construction this year. The "impact on contractors" is concluded to be "minimal" because there is no incumbent contract and because the Army views Fisher's likelihood of success at GAO to be low. AR 8. The next section of the D&F more fully considers the merits of plaintiff's protest at GAO and concludes, like the section before it, that plaintiff is unlikely to be successful at GAO, stating that most of its grounds for protest were late. AR

---

[5] We note that the *Reilly* factors, although often relied on in the review of override decisions based on urgent and compelling circumstances, are not mandatory legal requirements in every instance. *See, e.g.*, *PMTech, Inc. v. United States*, 95 Fed. Cl. 330, 345 (2010) (noting that the standard of review is arbitrary and capricious, not whether the agency has ticked off the list of *Reilly* factors). As noted by plaintiff, however, the Army has purported to bind itself to those *Reilly* factors by incorporating them into its supplemental acquisition regulations. As stated later, we do not reach the issue of whether this AFARS provision is binding and enforceable by plaintiff because we find the D&F adequate regardless.

[6] Intervenor argues, *inter alia*, that the D&F should be considered as meeting the alternative standard for an override: "best interests of the United States," which do not implicate the *Reilly* factors. *See* 31 U.S.C. § 3553(d)(3)(C)(i)(I). We do not reach that question, however, because it is clear that the D&F is authorizing the stay on the basis of urgent and compelling circumstances.

8-10.

Section 7, Basis for the Override, cites the national emergency at the southern border as a "security and humanitarian crisis" threatening core national security interests. AR 11 (quoting the President's Declaration of National Emergency). Without the override, the Army believes that it is "highly unlikely" that construction would be undertaken this fiscal year, and thus the 18-month delivery schedule would be lost. *Id.* It goes on to explain that DOD's allocation of $1 billion for the border barrier project expires this fiscal year. Failure to timely use those funds would negatively impact border security and military operational readiness, warns the D&F. *Id.*

Section 8, Reasonable Alternatives, recites that the COE Fort Worth District Director of Contracting, "considered all forms of alternative contractual mechanisms to bridge the gap during the pendency of the Protest," but found that only the letter contract used here could meet the government's needs. *Id.* The Director also indicates in this section that a review of historical average timelines for negotiating and awarding contracts of this magnitude reveals that 9-12 months would be necessary, which is antithetical to the government's goals of beginning construction this year and finishing within 18 months. *Id.*

The next, and final, section considers the harm to the government without an override. The gist is that the government's ability to complete the work in the 18-month timeline is a significant risk to its mission to secure the border. The Army cites the need for physical barriers to stem the tide of narcotics and individuals trafficked over the border. The El Paso sector is cited as a particularly active area of smuggling across the border with "at least three transnational criminal organizations" operating in the sector. AR 12. Serious amounts of narcotics are listed as having been interdicted in this sector (15,000 lbs of marijuana, 342 lbs of cocaine, 40 lbs of heroin and 200 lbs of methamphetamines). *Id.* The delay imposed by the CICA stay would cost roughly $4 million to the government, but more significant than monetary losses, the D&F states that the risk to human lives and wellbeing presented by the unsecured border is "immeasurable." *Id.* Thus, "the cost to the United States should GAO sustain the Protest, however unlikely, cannot adequately or fully be measured in dollars and cents." *Id.*

The D&F goes on to explain that the UCA contracting mechanism

7

used for the El Paso project is such that "only 50% of the required funding can be obligated at time of contract award. The remaining 50% of the funding remains unobligated until a proposal is received from the contractor and the UCA can be definitized into a Firm Fixed Price contract action." *Id.* at 12-13. The import of which is that the first 100 days of performance are "critical to the success of the entire action" because the inability to definitize the contract by the end of the fiscal year would threaten the entire project due to the expiration of funds. *Id.* at 13.

We are satisfied that the D&F clearly lays out the agency's consideration of the significant adverse consequences for proceeding with the stay in place. Plaintiff argues that the adverse consequences to border security are only a potential and not a necessary result of the CICA stay.[7] This, Fisher argues, is insufficient to meet the test because the agency in the D&F has not demonstrated an "immediate threat to health, welfare, or safety." *AT&T Corp. v. United States*, 133 Fed. Cl. 550, 556 (2017). We disagree. The D&F explicitly cites large quantities of illicit narcotics that have passed through the border area implicated in this procurement. We will not second guess the executive's conclusion that this presents an urgent and compelling danger to the health and welfare of American citizens and residents.

We are also satisfied that the agency has clearly addressed whether there are reasonable alternatives to the override that would meet the government's needs. Given the timeline for this project and the specter of the funds for it expiring, we find the agency's conclusion rational, and we will, again, not substitute our own judgment for that of the executive.

As to the third factor, the potential cost of the override compared with proceeding without it, including the risk that GAO might sustain, we find that, although some of the analysis is misplaced, the agency has met this requirement in the D&F. The agency conducted a risk analysis of the delay

---

[7] Plaintiff also argues that the potential loss of funds cannot provide the basis for compelling circumstances because FAR part 6.301(c) instructs that failure to properly plan or the expiration of funding is not a justification for an agency proceeding without full and open competition. 48 C.F.R. § 6.301(c) (2018). We find this regulation inapposite as it is a limit on agency authority to employ non-competitive procedures to procure goods and services rather than the circumstances faced here, a stay override.

associated with the 100-day stay, finding that such a delay would cost approximately $4 million.  This analysis, while cogent and relevant to the harm to the government posed by the stay, is not addressed to the cost to the government if GAO sustains the protest and the agency is forced to recompete the work.  The Army did consider, however, the nonmonetary costs associated with a stay of performance (humanitarian and border security concerns) and found them too great to ignore.   In the context of this procurement, we find this sufficient.  The D&F's statement that the costs associated with these problems are not strictly measurable in extra taxpayer dollars should the agency be forced to recompete is rational.

The fourth factor, the impact on competition and the integrity of the procurement system, is largely missing from the government's calculus in the D&F.  Plaintiff finds this *per se* objectionable and a violation of regulation that can only be remedied by enjoining or declaring insufficient the agency's D&F.  Defendant and intervenor argue that the D&F as adequate in this regard or that the fourth factor is not determinative here because either the AFARS provision is not legally binding or because it is merely procedural in nature and thus does not afford plaintiff the right to substantive relief for a mere failure to follow it in a *pro forma* manner.

We note that that intervenor has argued that the AFARS' adoption of the *Reilly* factors is problematic because that provision is not the product of notice and comment rulemaking.   Plaintiff argues that it need not be because it only supplements the already legally-promulgated provisions of the FAR.  Intervenor rejoins that enforcing that provision strictly against the Army creates a substantive legal requirement, the same as the substantive provisions of the FAR.   Ultimately, we do not reach the issue because it is unnecessary to our conclusion.

We find that the Army's consideration of the merits of Fisher's underlying GAO protest sufficient in these circumstances to meet the fourth *Reilly* prong and AFARS 5133.104.   Under normal circumstances, the agency would be required to consider whether CICA or other legal requirements were being, in effect, thwarted by the issuance of an override.  Here, however, where an agency is faced with a declared national emergency and has authorized use of non-competitive procurement procedures, the calculus necessarily shifts.   The public's interest in a competitive procurement is balanced against the agency's need to address the national emergency.   Congress has already made the determination that the

competitive procurement system is not overborne by the occasional need for expediency by excepting from CICA's competition requirements situations in which agencies face urgent and compelling circumstances, including overriding of the 100-day stay during a GAO protest.

Further, national security concerns must be considered by the court in any bid protest. 28 U.S.C. § 1491(b)(3) (2012). Here, they are particularly implicated by the President's declaration. The bona fides of the national emergency are assumed in this proceeding. As such, these concerns weigh heavily in favor of the government's conduct both on the merits of the protest and the balancing of harms when considering whether equitable relief is appropriate. As stated at the conclusion of oral argument, we find the declaration of a national emergency to be the anvil that falls on the scale of justice in favor of the government in these circumstances. It undergirds our consideration of the reasonableness of the Army's D&F and it suggests that relief would not be appropriate even if we found a legal infirmity in the override.

In sum, no relief can be granted. Plaintiff has not shown irrationality nor illegality in the agency's pursuit of an override nor has it established the requisite balancing of the equities in its favor to merit relief.[8] That is why we denied plaintiff's motion for judgment on the administrative record and granted the cross-motions of defendant and intervenor. Accordingly, the Clerk of Court is directed to enter judgment for defendant and to dismiss the complaint. No costs.

s/Eric G. Bruggink
Eric G. Bruggink
Senior Judge

---

[8] We agree with defendant that, whether declaratory or injunctive relief is the appropriate remedy, the court must consider the equities, including the balance of harms, when making such a determination. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1228 (Fed. Cir. 2004) (citing *Samuels v. Mackell*, 401 U.S. 66, 71-72 (1971) (holding that, in the context of state prosecutions begun prior to the federal suit, where the declaratory relief would have the same effect as injunctive, the same equitable principles must be considered)). Here, they weigh in favor of the government due to the national security crisis laid out by the President.